# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| NAILITE INTERNATIONAL, INC., | : | Case No. 09-10526 (MFW) |
| A Delaware corporation | : |  |
| Debtor. | : | **Hearing Date: February 27, 2009 at 11:30 p.m.** |
|  | : | **Objection Deadline: February 26, 2009 at 12:00 p.m.** |

## MOTION OF DEBTOR FOR ORDER (A) APPROVING BID PROCEDURES INCLUDING, WITHOUT LIMITATION, PROPOSED PURCHASER'S BREAK-UP FEE; (B) APPROVING FORM AND MANNER OF NOTICE; (C) SCHEDULING A HEARING TO CONSIDER THE SALE OF CERTAIN OF THE DEBTORS' ASSETS; AND (D) GRANTING RELATED RELIEF

Nailite International, Inc. (the "**Debtor**" or "**Seller**"), as debtor and debtor-in-possession, by its undersigned attorneys, hereby move this Court under sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (as amended, the "**Bankruptcy Code**"), and Fed. R. Bankr. P. 2002 and 6004 (as amended, the "**Bankruptcy Rules**") for an order (a) approving the proposed bid procedures (as set forth in Exhibit A, hereto, the "**Bid Procedures**") with respect to the proposed sale (the "**Proposed Sale**") of substantially all of the Debtor's assets used in the Debtor's manufacturing and distributing business (the "**Business**" or "**Acquired Assets**"), as set forth below and more particularly described in the Asset Purchase Agreement by and between Premier Exteriors, LLC ("**Proposed Purchaser**") and the Debtor (attached hereto in substantially final form as Exhibit B, the "**Agreement**")[1]; (b) approving the form and manner of notice of the Auction (as defined below) and the Bid Procedures; (c) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts, (d) approving a break-up fee and expense reimbursement provision,

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the same meanings ascribed to them in the Agreement.

(e) scheduling a hearing (the "**Sale Hearing**") and objection deadline with respect to the Proposed Sale; and (f) granting related relief (the "**Bid Procedures Relief**"). In support of this motion (the "**Motion**"), the Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT

As more fully set forth in this Motion and accompanying Sale Motion, the instant Bankruptcy Case was commenced because the Debtor has determined that in order to maximize the value of the Debtor's assets for the benefit of the Debtor's stakeholders, the Debtor must arrange for the sale of substantially all of its assets as soon as practicable given the fact that the Debtor does not have the revenue or other sources of funds to continue in business for an extended period of time. The Debtor has received an offer for its assets from the Proposed Purchaser. The Debtor believes that the Proposed Purchaser's offer is the highest and best offer for the Acquired Assets that it is likely to receive. Pursuant to the Agreement, the Proposed Purchaser may terminate the Agreement if (a) an order granting the instant Motion is not entered on or before **February 27, 2009**, (b) an auction is not held by **March 24, 2009**, (c) the Sale Hearing does not occur on or before **March 27, 2009**, or (d) the closing on the sale of the Business to Proposed Purchaser does not occur on or before **March 30, 2009** (unless extended by the parties).[2] Because Proposed Purchaser's offer is the only offer for the Business, and the Debtor requires a prompt sale process, delay in obtaining prompt approval of the Bid Procedures and the sale of the Acquired Assets to the Proposed Purchaser or the successful bidder at Auction (the "**Buyer**") will significantly impair the value of the Debtor's Acquired Assets and the ability

---

[2] Further, Proposed Purchaser may terminate the Agreement if (a) Purchaser is not the Successful Bidder, (b) the bidder submitting the Backup Bid is Purchaser, and (c) the Closing on the Sale of the Acquired Assets does not occur on or before April 1, 2009.

to close a sale of the business assets as a going concern, as well as the resultant recoveries to the Debtor's creditors and constituents.

## JURISDICTION AND VENUE

1.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363, 503 and 507 of the Bankruptcy Code and Bankruptcy Rule 6004.

## BACKGROUND

2.  On February 13, 2009 (the "**Petition Date**"), Nailite International, Inc. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") commencing the above-captioned bankruptcy case (the "**Bankruptcy Case**").

3.  The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.  No trustee or examiner has been requested or appointed, and no creditors' committee has been appointed in the Bankruptcy Case.

### Events Leading to Bankruptcy

**A.     Company Background**

5.  The Debtor has been a leading producer of injection molded polypropylene based cedar and masonry replica siding for over 30 years. Utilizing a unique manufacturing method which closely matches the look of real wood, brick and stone siding, the Debtor has been successful in selling its products around the world. The Debtor supplies the residential new construction and remodeling markets through various building material and siding distributors in the markets they serve throughout the world. The company is based in Miami, Florida.

**B.    Capital Structure**

6.    In April 2003, a credit agreement (the "**Credit Agreement**") was executed among the Debtor, National City Bank, as administrative agent and a lender, and Sovereign Bank and Firstrust Bank, as lenders. The obligations under the Credit Agreement were and are secured by all assets of the Debtor. The Credit Agreement provided for a term loan facility and revolving credit facility. Principal on the term loan facility is payable quarterly. In April of 2003, the Debtor also executed a note purchase agreement with American Capital Financial Services, Inc. for an unsecured subordinated term loan. The subordinated term loan was refinanced in November of 2006. At the end of 2003, the Debtor had in excess of $25MM in "long term debt."

7.    Over the next five years, the Debtor periodically defaulted on its financial covenants under the Credit Agreement. The Credit Agreement was amended four times in connection with financial covenant defaults.

8.    As of December 31, 2008, the Debtor had in excess of $32MM in "long term debt" including the debt under the Credit Agreement and the note purchase agreement. In addition, the Debtor owes approximately $4.1MM in trade/accrued payables as of December 31, 2008.

9.    At the end of 2008, the Debtor had approximately $1.5MM in accounts receivables. At the end of 2007, the Debtor's accounts receivable balance was approximately $2.1MM. The Debtor's inventory was valued at approximately $3.2MM as of December 31, 2008 and was down $1.1MM as compared to December 31, 2007.

10.    In January of 2009, Premier Exteriors, LLC purchased all of the rights of National City Bank, Sovereign Bank and Firstrust Bank under the Credit Agreement, including the obligations of the Debtor thereunder.

– 4 –

**C.      Factors Leading to the Filing of the Chapter 11 Case**

11.      The Debtor has been forced to enter into bankruptcy as result of the overall condition of the economy and, more specifically, the downturn in the domestic housing market.

12.      The Debtor's business correlates very closely to housing starts and, to a lesser degree, remodeling. Housing starts were up from 2000 through 2005 by approximately 30%. From the peak in 2005 to the trough of 2008 housing starts were down 56% with no expected increase in the short term given the uncertainty present in the global economic environment. As a result, the Debtor's earnings decreased from 2004 through 2008 by approximately 67% driven primarily by the decrease in housing starts.

13.      In the fourth quarter of 2008, housing starts were down 64% from the fourth quarter of 2007 while the Debtor's earnings decreased 176%. This precipitous decline in the housing market had a quick and deep negative impact on the Debtor.

14.      In addition, the Debtor also experienced a significant increase in warranty claims. During the past five years, warranty claim payments increased by 168% and the Debtor had to pay significant amounts to satisfy warranty obligations.

15.      Simply put, the housing market's affect on the Debtors ability to generate earnings compounded with the increase in warranty claims has overwhelmed the ability of the Debtor to satisfy its financial obligations.

16.      As a result, the Debtor's lack of liquidity resulted in its failure to pay the principal and interest owed to National City Bank pursuant to the Credit Agreement on December 31, 2008. On January 2, 2009, National City Bank sent a Notice of Default to the Debtor (the "January 2 Default Letter").

17.      On January 6, 2009, and having failed to cure the defaults set forth in the January 2 Default Letter, the Debtor received additional correspondence from National City Bank

– 5 –

indicating that (i) the revolving loan commitment was terminated, (ii) the balance of the obligations under the Credit Agreement were being accelerated and now due and owing, and (iii) an administrative hold was being placed upon all deposit accounts of the Debtor.

18.     With only a level of liquidity sufficient to fund operations for a short period of time, the Debtor hired Alix Partners to begin exploring all of its strategic alternatives. Very quickly, a decision was reached that the only viable alternative which would permit the Company to continue operating as a going concern and thereby preserve the remaining jobs and maximize recovery for all creditors was to pursue this restructuring process.

## D.     Objectives of the Chapter 11 Filing

19.     The Debtor commenced the Chapter 11 case to promptly and efficiently restructure their capital structure and operational footprint. In that regard, the Debtor has commenced this case having already taken significant steps: (i) securing adequate financing for this Chapter 11 case; (ii) beginning discussions with its most significant vendors regarding, among other things, support of Nailite as this case moves forward; and (iii) negotiating an asset purchase agreement with a stalking horse bidder to sell substantially all of its assets, subject to higher and better offers, through a Court approved process.

## The Proposed Sale Of The Debtor' Acquired Assets[3]

20.     Under the proposed Agreement, the Debtor would agree, subject to the approval of this Court, to (i) sell to the Proposed Purchaser the Acquired Assets, and (ii) assume and assign to the Proposed Purchaser certain of its executory contracts and unexpired leases

---

[3]     The following description of the terms of the Agreement and all the exhibits, schedules and attachments thereto is intended solely to give the Court and interested parties an overview of the significant terms of the Agreement. The Court and interested parties should refer to the Agreement, a copy of which is annexed hereto in substantially final form as Exhibit B.

identified in the Agreement as modified or amended from time to time (the "**Contracts**"), all subject to higher or otherwise better offers.

21. Pursuant to the Agreement, the Debtor proposes to sell, assign and transfer to Proposed Purchaser the Acquired Assets free and clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances to attach to the proceeds of the Sale. The principal terms of the Agreement are as follows:

    (a)    <u>Purchase Price</u>  Subject to certain prorations set forth in Section 3.2 of the Agreement, the aggregate consideration for the Purchased Assets shall be equal to the following, as calculated on the Closing Date:

        i.    obligations in the amount of $8.0 million outstanding under the Purchased Loan Agreement as of the Petition Date including the outstanding principal balance of the Notes, plus the amount of any accrued and unpaid interest payable through the Auction Date (the "Credit Bid Amount"); plus

        ii.    cash in the amount of $_____;[4] plus

        iii.    the assumption of the Assumed Liabilities (including the DIP Agreement).

    (b)    <u>Method of Payment</u>  Subject to the satisfaction of the conditions set forth in Sections 10.1 and 10.2 of the Agreement (or the waiver thereof by the party entitled to waive that condition), on the Closing Date, Proposed Purchaser shall deliver the Purchase Price in Proposed Purchaser's sole discretion and subject to Section 3.2 of the Agreement, as follows:

        i.    with respect to the Credit Bid Amount by, (x) paying cash, (y) delivering fully executed releases and waivers by the Note Holder of the aggregate amount of the Credit Bid Amount, or (z) assuming the Seller's obligations with respect to the Credit Bid Amount on terms reasonably acceptable to the Note Holder; and

        ii.    with respect to cash, by wire transfer of immediately available U.S. funds to the account or accounts identified by Sellers prior to the Closing Date.

---

[4] At the time of this filing, this component of the Agreement is being negotiated and finalized.

(c)     <u>Assumed Liabilities</u>

       i.     all Liabilities of Seller under the Assumed Contracts, if any, to the extent that such Liabilities arise on or after the Closing in the Ordinary Course of Business and all obligations in connection with the demonstration of adequate assurance of future performance required under Section 365(b)(1)(C) of the Bankruptcy Code;

       ii.     any and all earned vacation pay, sick leave and other paid time off of the Employees of the Seller who are hired by Proposed Purchaser immediately after the Closing and which arise at any time before, on or after the Closing Date;

       iii.     all Liabilities of the Seller as of the Closing Date for any accrued and unpaid claims that are allowed administrative expenses pursuant to Section 503(b)(9) or 546(c) of the Bankruptcy Code in an aggregate amount not to exceed the Allowed Administrative Amount;

       iv.     all Liabilities of the Seller under the DIP Agreement; and

       v.     all Liabilities for goods ordered or delivered after the Closing regardless of whether ordered by the Seller before the Closing.

(d)     <u>Acquired Assets</u>   The Debtor will sell and Proposed Purchaser will purchase the following assets:

All of the assets, rights, properties, claims, contracts and business of Seller that are used, useful, or necessary in the conduct or performance of Seller's Business, of every kind, nature, character and description, tangible and intangible, real, personal or mixed, wherever located, including but not limited to the following (as applicable and as the case may be):

       i.     all general intangibles, promissory notes and Accounts Receivable of Seller in substance and composition substantially similar to the schedule previously provided to Proposed Purchaser by Seller;

       ii.     all inventory, including, but not limited to, raw materials, work-in-process, finished goods, goods in transit, supplies, packaging, materials and labels in substance and composition substantially similar to the schedule previously provided to Proposed Purchaser by Seller;

       iii.     the Furniture and Equipment;

       iv.     the Assumed Intellectual Property, as identified on Schedule 1.1(b) of the Agreement;

v.  all Leases of the Seller listed on Schedule 1.1(c) of the Agreement, if any, that are assumed and assigned to the Proposed Purchaser pursuant to the Sale Order (the "**Assumed Leases**"), together with all security deposits related thereto and all permanent fixtures, improvements and appurtenances thereto and associated with such Assumed Leases, and any causes of action relating to past or present breaches of the Assumed Leases;

vi.  all Contracts of Sellers listed on Schedule 1.1(a) of the Agreement, if any, that are assumed and assigned to the Proposed Purchaser pursuant to the Sale Order (the "**Assumed Contracts**"), together with all security deposits related thereto and the right to receive income in respect of such Assumed Contracts on or after the Closing Date, and any causes of action relating to past or present breaches of the Assumed Contracts;

vii.  all Permits used by Seller in the Business, to the extent transferable;

viii.  all supplies owned by Seller and used in connection with the Business in existence as of the Closing Date;

ix.  all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Seller or to the extent affecting any Purchased Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets;

x.  all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Assumed Intellectual Property;

xi.  all insurance policies or rights to proceeds thereof relating to the Purchased Assets;

xii.  any asset that requires the consent of a third party to be transferred, assumed or assigned notwithstanding the provisions of Section 365 of the Bankruptcy Code, as to which such consent has not been obtained as of the Closing Date, upon receipt of such consent on or after the Closing Date and entry of an appropriate Assumption Order;

xiii.  any rights, claims, causes of action of Seller (other than Avoidance Actions) against third parties relating to the Purchased Assets; and

xiv.  all other tangible or intangible assets other than Excluded Assets.

PAC/903354

(e)     Excluded Assets;

      i.     cash, cash equivalents, bank balances, bank deposits or similar cash items of Seller and its Affiliates;

     ii.     All Excluded Leases;

    iii.     All Excluded Contracts;

    iv.     all Documents of Seller, including but not limited to, those that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to Products, services, marketing, advertising, promotional materials, Assumed Intellectual Property, personnel files for Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of Seller's premises, and any minute books, stock ledgers, corporate seals and stock certificates of Seller and its Affiliates, and other similar books and records that Seller or its Affiliates is required by Law to retain or that Seller reasonably determines are necessary or advisable to retain including Tax Returns, financial statements and corporate or other entity filings; provided, however, that the Proposed Purchaser shall have the right to make and retain copies (at Seller's expense) of any portions of such Documents that relate to the Business or any of the Purchased Assets; provided further, however, to the extent any of the foregoing Documents remain at a facility, office or other premises of Seller, Seller agree that Proposed Purchasers shall be entitled, through its officers, employees, consultants and representatives, to have access to such Documents upon reasonable advance notice to Seller;

     v.     any Avoidance Actions;

    vi.     all insurance policies or rights to proceeds thereof relating to the Excluded Assets;

    vii.     any rights, claims or causes of action of Seller against third parties relating to the Excluded Assets;

   viii.     any assets of Seller designated by the Proposed Purchaser as Excluded Assets pursuant to Section 2.1(c) of the Agreement;

    ix.     any rights of Seller under the Agreement;

     x.     assets held in trust for the benefit of Employees, such as assets held under any employee benefit plan;

xi.   all rights of Seller under any Contracts that are not Assumed Contracts;

xii.   any federal, state, local, and foreign tax refunds, credits or benefits or income tax attributes of Seller pertaining to or arising out of periods prior to the Closing Date;

xiii.   all letters of credit (including any letter of credit posted in connection with a lease of real property) and all deposits, excluding those arising out of or relating to the Assumed Liabilities, rights to refunds (including tax refunds paid in cash) and prepaid charges and expenses of Seller;

xiv.   all prepayments made with regard to insurance policies not assumed by the Proposed Purchaser pertaining to or arising out of periods prior to the Closing Date; and

xv.   all proceeds of all of the foregoing.

(f)   <u>Excluded Liabilities</u>.

i.   all Liabilities of Seller to any of its employees or under any employee benefit plans for periods prior to the Closing Date, except as otherwise provided for in the Agreement;

ii.   all Liabilities relating to or arising out of the ownership or operation of an Excluded Asset;

iii.   all Warranty Obligations and all other obligation to any Person relating to the quality, merchantability or safety of, or involving a claim of breach of warranty, or defect in, any product or service purchased, manufactured, sold, or performed by Seller;

iv.   all of the Liabilities of the Seller relating to or arising out of any real property owned at any time by the Seller or any of its Affiliates or predecessor entities.

v.   all Liabilities with respect to the Worker Adjustment and Retraining Notification Act (the "WARN Act") or any similar federal or state law with respect to any Employee;

vi.   Liability for any Income Taxes due or payable by Seller for any Tax period (or portion thereof) prior to the Closing Date or arising out of the ownership or operation of the Business or the Purchased Assets on or before the Closing Date; and

vii.   all Liabilities relating to amounts required to be paid by Seller under the Agreement.

- 11 -

22.     The Debtor shall be responsible for the payment of the cure amounts for monetary defaults, if any, necessary to assume and assign the Contracts.  On the Closing Date, the Debtor intends to assume and assign to the Buyer the Contracts.

## RELIEF REQUESTED

23.     By this Motion, the Debtor seeks entry of an order: (i) approving the Bid Procedures to be used to solicit the highest or otherwise best offer for the Acquired Assets, (ii) approving certain notice procedures with respect to the sale, (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts, (iv) approving a Break-Up Fee and Expense Reimbursement provision, and (v) scheduling the Sale Hearing (such order, the "**Bid Procedures Order**").  In addition, the Debtor also seeks, upon conclusion of the sale hearing, entry of an order (i) authorizing the sale of substantially all of the Debtor's assets to Proposed Purchaser, and the holder of $18MM in secured debt, pursuant to the Agreement, or such other asset purchase agreement as the Debtor may enter into with a Successful Bidder (as defined below) prior to the Sale Hearing (such a transaction, the "**Alternative Transaction**"); and (ii) authorizing the assumption and assignment of executory contracts and unexpired leases to the Proposed Purchaser or the Successful Bidder (such order, the "**Sale Order**").

## BASIS FOR RELIEF

### A.     Approval of Bid Procedures

24.     After extensive arm's length negotiation, the Debtor and the Proposed Purchaser executed the Agreement.  The hearing on the Bid Procedures Relief is intended to, among other things, approve the Proposed Purchaser as the "stalking horse" bidder in connection with the Debtor's solicitation of higher and better offers for the Debtor's assets.

- 12 –

25.     The Bid Procedures are designed to maximize value for the Debtor's estate, while ensuring an orderly sale process consistent with the timeline available to the Debtor under the Agreement and the terms of the Debtor's postpetition financing. The Bid Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified", the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any auction, and the selection and approval of any ultimately successful bidders (the "**Bidding Process**"). The Bid Procedures are the result of arm's length negotiations with the Proposed Purchaser.

26.     The Bid Procedures provide that any sale transaction must be closed by **March 30, 2009** (the "**Sale Timeline**"). The Debtor, in consultation with its key constituents, believes that a going concern sale of substantially all of its assets is the most prudent, if not the only viable, course for the Debtor to maximize asset value and creditor recoveries. The Debtor further believes, with the concurrence and support of its key constituents, that the Sale Timeline affords the Debtor a sufficient opportunity to pursue a sale process that will maximize creditor recoveries.

27.     The Debtor's business and the circumstances precipitating the commencement of this Bankruptcy Case are well known to members of, and investors in, the Debtor's industry. The Debtor is hopeful that the Bid Procedures will facilitate a robust sale process.

28.     The following is a summary of certain provisions of the Bid Procedures, but the full and complete Bid Procedures are attached hereto as Exhibit A and incorporated herein by reference as if set forth at length:

(a)     **Asset Sold:** Substantially all of the assets of the Debtor as more fully set forth in the Agreement. The assets to be sold do not include Avoidance Actions and other estate causes of action.

(b)    **Qualified Bidder:**  To ensure that only bidders with a serious interest in purchasing the Acquired Assets participate in the Bidding Process, the Bid Procedures provide for certain minimal requirements for a Potential Bidder to become a "Qualified Bidder".  These requirements include that a Potential Bidder deliver to the Notice Parties (as defined in the Bid Procedures) a confidentiality and non-disclosure agreement and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale, and that the Debtor determines is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale if selected as the Successful Bidder, and delivers to the Notice Parties a Qualified Bid.

(c)    **Qualified Bid:**  A bid received from a Potential Bidder that meets the following requirements is a "**Qualified Bid.**"  A bid is a letter from a Potential Bidder (other than Proposed Purchaser, whose participation as a Qualified Bidder shall be on the terms set forth in the Agreement) stating that (i) the Bidder offers to purchase the Acquired Assets and shall not receive any break-up fee, and (ii) the Potential Bidder's offer is irrevocable until 48 hours after the closing of the sale of the Acquired Assets.  A Potential Bidder (other than Proposed Purchaser) shall accompany its bid with (x) an agreement marked to show those amendments and modifications to the Agreement, (y) a deposit, to be paid by wire transfer, in the amount of ten percent (10%) of the offer payable to the order of Debtor's counsel, to be held by Debtor's counsel in escrow (the "**Good Faith Deposit**"), and (z) written evidence of a commitment for financing or other evidence of ability to consummate the transaction and payment of the purchase price in cash at the Closing, which shall occur at such time as the Sale Order becomes a final order. Unless otherwise waived by the Seller in writing, the Seller will consider a bid only if the bid:

i.    provides the name, address, and phone and facsimile numbers of the person designated to receive notices on behalf of such Potential Bidder and with authority to bind the Potential Bidder on all matters related to the Sale;

ii.    provides overall value for the Acquired Assets to the Debtor of at least $50,000 over the aggregate amount of the Purchase Price of Proposed Purchaser set forth in the Agreement plus the Breakup Fee and Expense Reimbursement;

iii.    is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder with respect to the assets sought to be acquired;

iv.     does not request or entitle the bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment; and

v.      is received by the Bid Deadline.

(d)     **Bid Deadline:** A Potential Bidder that desires to make a bid shall, on or before 12:00 Noon on the date that is three (3) business days prior to the date of the Auction submit such Bid to counsel for the Debtor and counsel for the Proposed Purchaser at the addresses set forth in the Bid Procedures.

(e)     **Auction:** If Qualified Bids have been received from at least one Qualified Bidder other than Proposed Purchaser that the Debtor determines is higher or otherwise better than the initial bid of Proposed Purchaser as set forth in the Agreement, the Debtor may conduct an absolute auction (the "**Auction**") with respect to the Acquired Assets. The Auction shall take place on a date and time to be set by the Court in the Bid Procedures Order, at the office of Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801, or such other time or other place as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids and expressed an intent to participate in the Auction.

(f)     **Auction Procedures:** The Debtor shall conduct the Auction in the manner it reasonably determines will achieve the maximum value for the Acquired Assets. Bidding at the Auction will commence with the highest Qualified Bid and shall continue in increments of not less than $25,000. The Debtor may adopt rules for bidding at the Auction that, in the Debtor's business judgment, will better promote the goals of the bidding process and that are not inconsistent with any of the provisions of the Agreement or the Bid Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith. Each Qualified Bidder shall have the right to submit a new or revised bid upon announcement of the highest and best bid from the immediately preceding round of bids. The bid announced by the Debtor as the highest and best bid at the last round of bidding shall be the successful bid (the "**Successful Bid**" and the bidder making such bid, the "**Successful Bidder**").

(g)     **Credit Bidding:** Qualified Bidders may make one or more credit bids of some or all of their claims to the fullest extent permitted by Section 363(k) of the Bankruptcy Code.

(h)     **Backup Bid Approval:** The Debtor may present to the Bankruptcy Court for approval both the Successful Bid and the next highest and best bid (the "**Backup Bid**"). Subject to Bankruptcy Court approval, the Debtor shall effect the Sale with the Successful Bidder. If the Successful Bidder fails to

- 15 –

consummate an approved Sale because of a breach or a failure to perform on the part of such Successful Bidder, the next highest or otherwise best Qualified Bid, as approved at the Sale Hearing, shall be deemed to be the Successful Bid and the Debtor shall be authorized to effect such Sale without further order of the Bankruptcy Court. If the Successful Bidder fails to consummate the Asset Sale, and such failure is the result of a breach by the Successful Bidder, the Good Faith Deposit shall be forfeited to the Debtor and the Debtor specifically reserves the right to seek all available damages from such entity or person.

(i) **Good Faith Deposit for Successful Bid and Backup Bid:** At the conclusion of the Auction, the Successful Bidder and the bidder that made the Backup Bid shall increase its Good Faith Deposit to an amount equal to ten percent (10%) of the Successful Bid and Backup Bid, respectively.

29.     At or before the Sale Hearing, the Debtor may impose such other terms and conditions as they may determine to be in the best interests of its estate and other parties in interest, so long as such terms and conditions are not inconsistent with the Agreement.

## B.     Notice Procedures.

30.     The Debtor seeks to have the Sale Hearing on or before March 27, 2009, as required by the Agreement. In fact, pursuant to the Agreement, Proposed Purchaser has the right to terminate the Agreement if the Auction does not occur by March 24, 2009 and the sale of the Acquired Assets to Proposed Purchaser does not close within six (6) days of the Sale Hearing.

31.     While the Debtor is serving all persons and entities identified in the Sale Motion with the Sale Motion, the Debtor requests that they not be required to serve the Agreement upon all such persons and entities, but state that the Agreement is available upon request to Debtor's counsel. The cost of making a substantial number of copies of the Agreement (including schedules thereto) will be significant. The Debtor intends to serve the Agreement with this Motion upon (i) the Office of the United States Trustee; (ii) counsel to the Proposed Purchaser; (iii) the twenty largest unsecured creditors of the Debtor; (iv) all entities known to have expressed an interest in acquiring any of the Acquired Assets within the last twelve months; (v)

- 16 -

all entities known to have asserted any lien, claim, encumbrance or other interest in or upon any of the Acquired Assets; (vi) state and local regulatory authorities with jurisdiction over the Debtor, (vii) the office of the United States Attorney, and (viii) all parties who have requested notice pursuant to Bankruptcy Rule 2002.

32.     Not later than three (3) business days after the entry an Order approving this Motion, the Debtor will cause the Notice of Auction Procedures and Sale Hearing, substantially in the form attached hereto as Exhibit C, to be sent by first-class mail, postage prepaid, to all of the Debtor's creditors, all entities known to have expressed a bona fide interest within the last twelve months in acquiring the Acquired Assets, the Office of the United States Trustee, counsel for any statutory committee appointed in the Bankruptcy Case (a "Committee"), all federal, state and local regulatory authorities with jurisdiction over the Debtor, the office of the United States Attorney, and all non-Debtor parties to contracts or leases (executory or otherwise), all persons and entities known to have asserted an Interest in the Acquired Assets, and otherwise known parties-in interest in the Bankruptcy Case.

33.     The Debtor will also publish a notice (the "**Sale Publication Notice**") of the proposed sale, substantially in the form attached hereto as Exhibit D, in the National Edition of The Wall Street Journal and the trade publication Plastic, Inc. Such notice is good and proper notice to such interested parties, including those whose identities are unknown to the Debtor.

34.     As part of the Sale, the Debtor seeks authority to assume and assign executory contracts and unexpired leases (the "**Assumed Executory Contracts**") to the Proposed Purchaser or another Successful Bidder.

35.     In addition, to facilitate the sale, assumption and assignment of the Assumed Executory Contracts, the Debtor proposes to serve the notice (the "**Cure Amount Notice**"),

- 17 -

substantially in the form attached as Exhibit E hereto, no later than fifteen (15) days before the Sale Hearing and request that the Court approve the following procedure for fixing any cure amounts owed on all unexpired leases, license agreements and executory contracts.

36.     The Debtor will attach to the Cure Amount Notice its calculation of the undisputed cure amounts that the Debtor believes must be paid to cure all prepetition defaults under all unexpired leases, license agreements and executory contracts then included in the Contracts (the "**Prepetition Cure Amounts**"). If no amount is listed on the Cure Amount Notice, the Debtor believes that there is no Prepetition Cure Amount. The Debtor requests that unless the non-Debtor party to an unexpired lease, license agreement or executory contract files an objection (the "**Cure Amount Objection**") to its scheduled Prepetition Cure Amount on or before 4:00 p.m. (prevailing Eastern Time) five days prior to the Sale Hearing (the "**Cure Objection Deadline**") and serves a copy of the Cure Amount Objection so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon (i) counsel to the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801, Attn: Steven M. Yoder, Esquire, (ii) counsel to the Proposed Purchaser, Drinker Biddle & Reath LLP, 1100 N. Market Street, Suite 1000, Wilmington, DE 19801-1254, Attention: Andrew C. Kassner, Esquire; (iii) counsel to the Committee, and (iv) the United States Trustee's Office, 844 King Street, Room 2313, Wilmington, Delaware, 19801 (the "**Notice Parties**"), such non-Debtor party should (x) be forever barred from objecting to the Prepetition Cure Amount and from asserting any additional cure or other amounts with respect to such unexpired lease, license agreement or executory contract and the Debtor shall be entitled to rely solely upon the Prepetition Cure Amount; and (y) be deemed to have consented to the assumption and assignment of such unexpired lease, license agreement or executory contract and shall be forever

- 18 -

barred and estopped from asserting or claiming against the Debtor, the Proposed Purchaser or such other successful bidder or any other assignee of the relevant unexpired lease, license agreement or executory contract that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such unexpired lease, license agreement or executory contract.

37.     In the event that a Cure Amount Objection is filed, the Cure Amount Objection must set forth (i) the basis for the objection, and (ii) the amount the party asserts as the Prepetition Cure Amount. After receipt of the Cure Amount Objection, the Debtor will attempt to reconcile any differences in the Prepetition Cure Amount believed by the non-Debtor party to exist. In the event, however, that the Debtor and the non-Debtor party cannot consensually resolve the Cure Amount Objection, the Debtor will segregate any disputed cure amounts pending the resolution of any such disputes by this Court or mutual agreement of the parties[5].

38.     The Debtor requests that unless a person or party in interest files an objection (the "**Sale Objection**") to the Sale Motion on or before 4:00 p.m. (prevailing Eastern Time) seven days prior to the Sale Hearing (the "**Sale Objection Deadline**") and serves a copy of the Sale Objection so as to be received by the Notice Parties no later than 4:00 p.m. (prevailing Eastern Time) on the same day, such person or party in interest should be forever barred from objecting to the Sale.

## C.     Stalking Horse Bid Protections

---

[5] The Debtor is filing simultaneously with the filing of the instant Motion, Debtor' Motion for an Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (i) Authorizing The Sale of Certain Assets, Free and Clear of Liens, Claims, Encumbrances, and Interests Subject to Higher and Better Offers; (ii) Approving an Asset Purchase Agreement; (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with such Sale; and (iv) Granting Related Relief (the "**Sale Motion**").

39.     The Proposed Purchaser has expended, and likely will continue to expend, considerable time, money and energy pursuing the acquisition of the Acquired Assets and has engaged in extended arm's-length and good faith negotiations with the Debtor.  In recognition of this expenditure of time, energy, and resources, the Debtor has agreed to provide to the Proposed Purchaser certain bidding protections, including the Break-Up Fee and Expense Reimbursement. The proposed Break-Up Fee and Expense Reimbursement is equal to three percent (3%) of the ultimate sale price received by Sellers for the Acquired Assets, regardless of the actual amounts expended by the Proposed Purchaser.  The Agreement, at section 7.4, provides as follow with regard to the Proposed Purchaser's right to receive the Break-Up Fee:

> The Bidding Procedures Order shall provide that the Proposed Purchaser (assuming Proposed Purchaser is not in material default of the Agreement) shall be entitled to be paid an amount equal to three (3%) percent of the Purchase Price as a combined break-up fee and expense reimbursement (the "Break-Up Fee and Expense Reimbursement") if (a) the Bankruptcy Court approves an Alternative Transaction with a Qualified Bidder other than the Proposed Purchaser and (b) the Seller either consummates such an alternative transaction or fails to consummate a transaction with the Proposed Purchaser or any other Qualified Bidder.  The Break-Up Fee and Expense Reimbursement described in this Section shall be paid (i) upon the occurrence of the consummation of the Alternative Transaction, by the winning Qualified Bidder or (ii) if no transaction (including a transaction with the Proposed Purchaser) is consummated within fifteen (15) days following Bankruptcy Court approval of such Alternative Transaction, by the Seller.

40.     The Debtor and Proposed Purchaser negotiated a minimum overbid amount of $50,000 (the "**Overbid Amount**").  The Debtor submits that, given the value of this transaction, a minimum initial incremental Overbid Amount is reasonable and appropriate.

41.     The Debtor respectfully submits that the Break-Up Fee and Expense Reimbursement and Overbid Protection, are material inducements for, and a condition of, the Proposed Purchaser's entry into the Agreement.  The Debtor believes that the Break-Up Fee and

Expense Reimbursement is reasonable because of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Proposed Purchaser in connection with the transactions and (b) the fact that, if the Break-Up Fee and Expense Reimbursement is triggered, the Proposed Purchaser's efforts will have increased the chances that the Debtor will receive the highest or otherwise best offer for the Acquired Assets, to the benefit of the Debtor's creditors.

## APPLICABLE AUTHORITY

### The Bidding Procedures

42.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or public auction. Consistent with the Agreement and bankruptcy auction procedures approved routinely in this District, the Debtor believes that the proposed Bid Procedures will assist the Debtor in maximizing the value that it may obtain for the Acquired Assets. Consequently, the Debtor respectfully submits that granting the requested relief is "appropriate" under the circumstances and is in the best interests of the Debtor, its bankruptcy estate, creditors and other parties-in-interest.

### The Bidding Protections are Necessary and Reasonable

43.     The Debtor seeks approval of the overbid protections and authority to pay the Break-Up Fee and Expense Reimbursement if the Proposed Purchaser becomes entitled to it pursuant to the Agreement. The Break-Up Fee and Expense Reimbursement and other bidding protections are beneficial to the Debtor's estate. The Proposed Purchaser's bid for the Acquired Assets has established a floor for further bidding on the Acquired Assets. If the Proposed Purchaser is not the successful bidder because the Debtor has received a higher or otherwise

- 21 –

better offer, the Debtor will have benefited from the floor established by the Proposed Purchaser's proposal.

44.     In this Circuit, approval of the Break-Up Fee is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit Court of Appeals in Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527 (3d Cir. 1999). In O'Brien, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the Debtor' estates. Id., at 533.

45.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id., at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the Debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

46.     Bankruptcy courts are also guided by the principles of the "business judgment" rule in evaluating a debtor's decision to offer a break-up or topping fee. See The Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 658 (S.D.N.Y. 1992) ("A bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length

- 22 –

negotiations."), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); see also In re 995 Fifth Ave. Assocs.,
96 B.R. 24 (Bankr. S.D.N.Y. 1989); cf. In re America West Airlines, Inc., 166 B.R, 908, 913
(Bankr. D. Ariz. 1994) (applying a "best interest of the estate" standard). Break-up fees for
purchasers of chapter 11 debtors and/or its assets constitute appropriate compensation for the risk
involved in preparing and proposing a bid, which thereby enhances the value of the debtor's
estate by attracting initial bids and establishing a minimum standard for competing bids. See
Integrated Resources, 147 B.R. 650 (break-up fees are "important tools to encourage bidding and
to maximize the value of the debtor's assets"); In re Crowthers McCall Pattern, Inc., 166 BR.
908, 913 (Bankr. S.D.N.Y. 1990) (decision to enter into agreement including break-up fee amply
justified by need to prevent prospective bidder from withdrawing from transaction).

47.     A break-up fee should be "reasonably related to the bidder's efforts and the
transaction's magnitude." In re Integrated Resources, 147 B.R. at 662-63. In this case, the
Break-Up fee is three percent (3%) of the ultimate sale price received by Sellers for the Acquired
Assets . The Break-Up Fee is consistent with the range of those that have been approved by this
Court in other cases. See In re Montgomery Ward, Case No. 97-1409 (PJW) (Bankr. D. Del.)
(fee of 2.7% upheld); In re Mobile Media Communications. Inc., Case No. 97-174 (PJW)
(Bankr. D. Del.) (fees of 2.9% and 3.2% upheld); In re HHL Fin'l Servs. Inc., Case No. 97-398
(SLR) (Bankr. D. Del.)(approving 5.5% to 5.9% break-up fees); In re American White Cross
Inc., Case No. 96-1109 (PJW) (Bankr. D. Del. 1997) (approving up to 5.8% break-up fee plus up
to $450,000 in expense reimbursement); In re Mid-American Waste Sys., Inc., Case No. 97-0104
(PJW) (Bankr. D. Del.) (3% fee plus up to $1 million in expenses approved); In re Simmons
Upholstered Furniture, Inc., Case No. 94-635 (HSB) (Bankr. D. Del.) (approving 4.64% fee and
up to $650,000 in expenses); In re Smith Corona Corp., Case No. 95-788 (HSB) (Bankr. D. Del.)

(approving 3.9% fee plus $500,000 in expenses); In re Edison Bros. Stores Inc., Case No. 95-1354 (Bankr. D. Del.) (approving break-up fees up to 3.5% plus reasonable fees and expenses up to $100,000).

48.     Outside the bankruptcy context, courts commonly approve breakup/topping fees. Such fees are presumptively appropriate under the business judgment rule and nonbankruptcy courts rarely rule on its propriety. In re Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); see also Cottle v. Storer Communications, Inc., 849 F.2d 570 (11th Cir.. 1988); CRTF Corp. v. Federated Dep't Stores, Inc., 683 F. Supp. 422, 440 (S.D.N.Y. 1988); Samjens Partners I v. Burlington Indus., Inc., 663 F. Supp. 614 (S.D.N.Y. 1987).

49.     In the instant case, the Debtor has determined in its sound and reasonable business judgment that the Break-Up Fee and Expense Reimbursement and other bidding protections are beneficial to the Debtor's estate. Naming of the Proposed Purchaser as the "stalking horse" fosters the auction process and enhances and preserves the value of the Acquired Assets. The Proposed Purchaser's "stalking horse" bid will establish a floor for further bidding on the Acquired Assets. If the Proposed Purchaser's bid is not the successful bid because the Debtor receives a higher or otherwise better offer, the Debtor will have benefited from the floor established by the Proposed Purchaser's proposal.

50.     The Proposed Purchaser has made it clear that it would not have tendered its initial bid without the assurance of a break-up fee. The Break-Up Fee and Expense Reimbursement and other terms of the Agreement were the product of negotiations between the parties. The Break-Up Fee and Expense Reimbursement is an essential term to the Proposed Purchaser, protecting its investment in negotiating and performing due diligence in connection

- 24 -

with the proposed sale. Accordingly, the Break-Up Fee and Expense Reimbursement "induced [Proposed Purchaser] to expend time and resources to research the value of the [Acquired Assets] and to convert that value into a dollar figure on which other bidders can rely." O'Brien, 181 F.3d at 533.

51.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Break-Up Fee should be approved. Subject to the DIP Budget, DIP documents and DIP Order, the Debtor requests that the Court authorize payment of the Break-Up Fee and Expense Reimbursement as defined in, and pursuant to the terms and conditions of, the Asset Purchase Agreement and imposition of the Overbid Protection.

## NOTICE, NO PRIOR REQUEST, WAIVER OF BRIEF

52.     Notice of this Motion has been given to: (i) the Office of the United States Trustee; (ii) counsel to the Proposed Purchaser; (iii) the thirty (30) largest unsecured creditors of the Debtor; (iv) all entities known to have expressed an interest in acquiring any of the Acquired Assets within the last twelve months; (v) all entities known to have asserted any lien, claim, encumbrance or other interest in or upon any of the Acquired Assets; (vi) state and local regulatory authorities with jurisdiction over the Debtor, (vii) the office of the United States Attorney, (viii) all non-Debtor parties to contracts or lease (executory or otherwise), and (ix) all parties who have requested notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. L.R. 2002-1. The Debtor submits that such notice constitutes good and sufficient notice of this Motion and all proceedings to be held thereon, and that no other or further notice need be given.

53.     No previous motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtor respectfully requests the Court grant the relief requested in this Motion in all respects, and grant such other and further relief as is just and proper.

Dated: Wilmington, Delaware
      February 18, 2009

POTTER ANDERSON & CORROON LLP

Steven M. Yoder (DE Bar No. 3885)
Gabriel R. MacConaill (DE Bar No. 4734)
R. Stephen McNeill (DE Bar No. 5210)
Hercules Plaza, Sixth Floor
1313 N. Market Street
P.O. Box 951
Wilmington, Delaware 19899-0951
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

*Proposed Counsel for Debtor and Debtor in Possession*